## Commonwealth v. Koenig

Gregory Abeln, for Commonwealth.
Richard F. Maffett, Jr., for defendant.

HOFFER, J., July 31, 1984—This case comes to us on post-trial motions filed after a verdict against defendant from a conviction for speeding. Defendant moves in arrest of judgment on the ground that the Commonwealth's evidence was insufficient to prove beyond a reasonable doubt that defendant drove his tractor-trailer at a speed of 74.8 miles per hour in a 55 miles per hour zone. His motion for a new trial alleges that the court's decision was contrary to the weight of the evidence.

The only witness to testify was Pennsylvania State Policeman James Fox whose testimony presented the following facts. On the evening of July 26, 1983, Fox was patrolling a stretch of the Pennsylvania Turnpike near Newville. Fox's patrol car was equipped with a Vascar-plus electrical-mechanical speed timing device approved by the Pennsylvania Department of Transportation (PennDOT),[1] which had been calibrated pursuant to PennDOT regulations, only four days before, by an officially appointed maintenance and calibration

---

1. See 67 Pa. Code § 105.91 and 10 Pennsylvania Bulletin p. 3212, § 337.37 (August 2, 1980).

station.[2] Fox had successfully completed the 40-hour course for operation of Vascar on March 11, 1982.

At the beginning of Fox's shift that evening, he field tested the calibration of the Vascar unit and found it to be operating properly. At approximately 9:45 p.m. Fox was traveling west on the turnpike when he noticed, in his rearview mirror, a vehicle rapidly approaching him from the rear. Fox used the Vascar unit to time the approaching vehicle over a distance measured by the end points of two contiguous sections of guardrail, in a manner called "rear clocking." The unit automatically computed the vehicle's speed to be 74.8 miles per hour. Fox then stopped the tractor-trailer and cited defendant.

The maximum speed limit in force on that portion of the turnpike was 55 miles per hour and the weather was clear and dry. During the timing, no other vehicles or impediments blocked Fox's view of the guardrails he had selected for the measurement nor did Fox lose sight of defendant's vehicle at any time.

Fox further explained the purpose and method of use of the Vascar system as follows.[3] Vascar allows

---

2. The Commonwealth presented the official certificate of accuracy from the maintenance and calibration station that performed the calibration, Systems Innovation, Inc. of Hallstead, Pa. See 67 Pa. Code § 104.92 et seq. and 10 Pa. Bulletin pp. 3212-3213, §337.38 et seq. (August 2, 1980).

3. A brief description of Vascar hardware is provided by a New York case:

The VASCAR unit is composed of four modules: an odometer module which measures distance, a switch module which is used by the operator to activate the time and distance measuring devices, a display module on which the resulting speed is displayed and lastly, a computer module which records the distance, measures the time and divides the time into distance.

548

the officer to measure the time it takes a suspected speeder to travel a measured distance by operating separate time and distance switches on the car-mounted unit. A computer within the unit computes the average speed using the time and distance measurements.

In order to measure the distance traveled, the operator observes a visible reference point from which to begin measuring distance and, when he crosses that point in the patrol car, he switches on the distance measure. The operator then chooses a second reference point to end the distance measurement and as he crosses that point he switches off the distance measure. The distance measurement is recorded by the computer's memory.

The Vascar unit also measures the time required for a suspected offender to travel the previously

---

The odometer module is connected to the speedometer cable of the vehicle in which the unit is installed. When the distance switch is activated the revolutions of the cable are transformed into impulses which are counted by the computer. In this manner the computer measures the distance travelled by the vehicle in which it was installed. The accuracy of the speedometer is immaterial. The important factor here is that the cable will be consistent in the number of revolutions per mile.

Time is measured by use of an oscillator which produces impulses at a rate of 170.7 each second [Vascar-plus uses an oscillating crystal to measure time, just as does a quartz watch] when the time switch is activated the computer counts the number of impulses and in this way it measures time. There is a voltage regulator in the computer which insures the accuracy of the oscillator.

People v. Persons, 60 Misc. 2d 803,    , 303 N.Y.S. 2d 728, 730 (1969).

This description of the workings of Vascar is dated. Since 1969, the Vascar hardware has been improved and modernized with contemporary technology and now the unit is called Vascar-plus. The principle upon which it operates, however, remains unchanged.

measured distance. To measure time, the operator observes the suspect vehicle cross the first reference point and he switches on the time measure. When the suspect vehicle crosses the second reference point the operator switches off the time measure. The computer uses the premeasured distance and the time to compute average speed.

The method of operation of Vascar for a "rear clocking" differs only in sequence of procedures from the method we previously described. During a "rear clocking" time and distance are measured almost simultaneously. The operator chooses a reference point and switches on the distance measure as he crosses that point. Next he watches in his rearview mirror as the suspected violator crosses the first reference point and at that instant the operator switches on the time measure. The operator chooses the second reference point and, as he crosses it, switches off the distance measure. The operator again observes the suspected violator in his mirror and as the violator crosses the second reference point the operator switches off the time measure. Although the sequence of procedures in "rear clocking" differs from the method we first discussed, the resulting computation is identical.

In the instant case Fox chose the ends of two contiguous sections of guardrail as his reference points because, at night, a vehicle's lights make a reflection on the guardrail. When the suspected violator is approaching the patrol car from behind, the reflection is easily visible in the trooper's rear-view mirror until the vehicle reaches the guardrail's end. At the exact instant the vehicle crosses the end point of the guardrail, the reflection ceases. Using the ends of the guardrails as reference points, Fox could tell exactly when defendant's vehicle crossed them simply by watching the reflection cease.

Fox testified specifically that when the patrol car crossed the end of the first guardrail he switched on the distance measure. He observed, in his rear-view mirror, defendant crossing the end of the first guardrail. At the instant the reflection from defendant's lights moved off of the guardrail Fox switched on the time switch. When Fox's patrol car crossed the end of the second guardrail .8158 of a mile later, he switched off the distance measure. Fox maintained his vigil of defendant's vehicle until it crossed the end of the second guardrail. At the instant the reflection from defendant's lights moved off of the second guardrail, Fox switched off the time measure. The Vascar unit's computer divided the distance traveled by the corresponding time and obtained an average speed of 74.8 miles per hour.

With this factual and technical background we inquire as to the sufficiency of the evidence to sustain defendant's conviction. The standard for review of a motion in arrest of judgment has been aptly stated and supported:

"In passing upon such a motion [in arrest of judgment], the sufficiency of the evidence must be evaluated upon the *entire trial record*. All of the evidence must be read in the light most favorable to the Commonwealth and it is entitled to all reasonable inferences arising therefrom. The effect of such a motion is to admit all the facts which the Commonwealth's evidence tends to prove. [Citations omitted.] (Emphasis in original.)
Commonwealth v. Tabb, 417 Pa. 13, 16, 207 A.2d 824, 826 (1965); Commonwealth v. Winebrenner, 439 Pa. 73, 77-78, 265 A.2d 108 (1970); Commonwealth v. Terenda, 433 Pa. 519, 523, 252 A.2d 635 (1969); Commonwealth v. Hazlett, 429 Pa. 476, 478, 240 A.2d 555, 556 (1968). In order for a trial court to properly grant a criminal defendant's mo-

tion in arrest of judgment on the ground of insufficient evidence; 'it must be determined that accepting all of the evidence and all reasonable inferences therefrom, upon which it believed [the verdict could properly have been based], it would be nonetheless insufficient in law to find beyond a reasonable doubt that the [defendant] is guilty of the crime charged.' Commonwealth v. Blevins, 453 Pa. 481, 483, 309 A.2d 421, 422 (1973); Commonwealth v. Froelich, 458 Pa. 104, 106, 326 A.2d 364, 365 (1974); Commonwealth v. Winebrenner, supra; Commonwealth v. Terenda, supra. Commonwealth v. Meadows, 471 Pa. 201, 205-206, 369 A.2d 1266, 1268 (1977).

In determining the sufficiency of the evidence we must not engage in weighing it. Commonwealth v. Slout, 288 Pa. Super. 471, 434 A.2d 609 (1981). Rather, we must "determin[e] the absence or presence of that quantum of evidence necessary to establish some proof of the elements of the crime." Commonwealth v. Meadows, 471 Pa. 201, 208, 369 A.2d 1266, 1269 (1977). Therefore, we answer the central question: "Whether [the] evidence with all reasonable inferences from it, was sufficient to prove guilt beyond a reasonable doubt[?]" Commonwealth v. Miller, 303 Pa. Super. 504, 507, 450 A.2d 40, 41 (1982).

Defendant advances two specific challenges to the Vascar reading as sufficient evidence to convict him of speeding. First, he argues that the calibration and operation of the device were so extraordinary as to render the Vascar reading inherently unreliable. Defendant states that Fox "calibrated" the unit using a one-third of a mile distance and later clocked defendant using a .8158 of a mile distance. Both distances varied from those of PennDOT regulations, requiring one-fourth of a mile for calibration. The disparity between the distances, he contends, renders the reading suspect.

Defendant's argument demonstrates that he did not comprehend Trooper Fox's testimony or the characteristics of Vascar. PennDOT requires the official maintenance and calibration stations to test and calibrate each Vascar unit using a one-fourth of a mile distance.[4] Once a unit is calibrated at this distance, as was the unit Fox used, only four days prior to defendant's arrest, it is accurate at any distance within the machine's capacity.[5]

Fox testified that he field tested the unit's accuracy using a one-third of a mile distance at the beginning of his shift. The purpose of field test is only to assure that the unit is functioning properly, as was the unit in question. Furthermore, the distance used by Fox to measure defendant's speed was a reasonable distance, dictated by the location of reliable reference points. Because of the accuracy of Vascar at distances in excess of the prescribed one-fourth of a mile, defendant's argument must fail.

Secondly, defendant argues that the circumstances of the speed measurement were also so extraordinary and unusual as to cause the Vascar reading to be unreliable. Defendant contends that the darkness and the distance separating Fox's patrol car from defendant's tractor-trailer could have caused Fox to mistake another guardrail for his reference point or commit other errors reducing the reading's accuracy.

Fox's detailed testimony that he had properly performed the "rear clocking" and the resulting reading of 74.8 miles per hour are sufficient to support the conviction. Viewing the evidence in the light

4. 67 Pa. Code §105.95 and 10 Pa. Bulletin p. 3213, §337.41 (August 2, 1980).

5. Vascar-plus units, like the one used by Fox, are capable of measuring distances from .002 of a mile to 100 miles.

most favorable to the Commonwealth we must conclude that they have fulfilled the burden.

Defendant moves for a new trial on the ground that the verdict is against the weight of the evidence.

"A court will grant a new trial on the ground that the verdict was against the weight of the evidence only where it 'appear[s] from the record that the [fact finder's] verdict was so contrary to the evidence as to shock one's sense of justice and to make the award of a new trial imperative, so that right may be given another opportunity to prevail." Commonwealth v. Barnhart, 290 Pa. Super. 182, 185, 434 A.2d 191, 192 (1981). Commonwealth v. Laing, 310 Pa. Super. 105, 110, 456 A.2d 204, 207 (1983). See also, Commonwealth v. Hennemuth, 294 Pa. Super. 360, 367, 439 A.2d 1241, 1244, N. 8 (1982).

Granting a new trial is within the discretion of the trial court. Commonwealth v. Zapata, 447 Pa. 322, 327, 290 A.2d 114, 117 (1972); Commonwealth v. Starks, 298 Pa. Super. 213, 215, 444 A.2d 736, 738 (1982). Moreover, "it is true that a new trial may be granted if a verdict is against the weight of the evidence even if the evidence is legally sufficient to sustain a guilty verdict." Commonwealth v. Bowermaster, 297 Pa. Super. 444, 453, 444 A.2d 115, 119 (1982).

Defendant presented no evidence at the hearing. Instead he relied on the possibility that the Commonwealth would be unable to prove its case and on the possibility that cross-examination of Fox would expose weaknesses in the prosecution's case. Defendant's strategy did not succeed. Fox's testimony was credible, believable, convincing and, although technical at times, completely within reason. Accordingly, we find the verdict to be consistent with the weight of the evidence.

554

## ORDER OF COURT

And now, July 31, 1984, for the reasons stated in the opinion filed this date, defendant's motion in arrest of judgment and motion for a new trial are hereby denied.